IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN RE: APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANT AND ORDERS PURSUANT TO 18 U.S.C. §§ 2703(C)(1)(A) AND 3122(A)(1) FOR THE | |
| (1) DISCLOSURE OF PROSPECTIVE CELL-SITE DATA AND E-911 PHASE II DATA; | Case No.: 1:22-SW-448 |
| (2) DISCLOSURE OF STORED TELECOMMUNICATIONS RECORDS; AND | Case No.: 1:22-EC-1183 |
| (3) INSTALLATION OF A PEN REGISTER/TRAP AND TRACE DEVICE | **UNDER SEAL** |
| ON THE CELLULAR DEVICE ACCESSING IPV6 2600:1003:b12f:6e29:122:cc62:83f8:6b72 ON AUGUST 17, 2022 AT 08:55:02 UTC THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | |

**AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE**

I, Samuel Supnick, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an Application for a Search Warrant under 18 U.S.C. §§ 2703(c)(1)(A) for information associated with THE CELLULAR DEVICE ACCESSING IPV6 2600:1003:b12f:6e29:122:cc62:83f8:6b72 ON AUGUST 17, 2022 AT 08:55:02 UTC THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS ("TARGET CELL PHONE"), which is serviced by VERIZON WIRELESS ("TELEPHONE SERVICE PROVIDER"). As a provider of wireless communications service, the TELEPHONE SERVICE

PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.  Because this warrant seeks the prospective collection of information, including cell site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4) ("pen/trap device"), the requested warrant is designed also to comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121–3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.  The information to be searched is described in the following paragraphs and in Attachment A.  This Affidavit is made in support of an Application for a Search Warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the TELEPHONE SERVICE PROVIDER to disclose to the government the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

4.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, ("ATF") and have been since 2017.  I am "an investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am an officer of the United States who is empowered by law to conduct investigations of and make arrests for the offenses enumerated in Titles 18, 21, and 26 of the United States Code.

5.  Through the ATF, I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center, as well as the Special Agent Basic Training Program at the ATF National Academy.  During these programs, I received training regarding the investigation of

violations of federal firearms, narcotics, explosives, and arson statutes.  Prior to employment with ATF, I served for approximately three and a half years as an officer with the Montgomery County, Maryland Police Department.  My training and experience has involved, among other things: (1) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the purchase, possession, distribution, and transportation of firearms and controlled substances and of the laundering and concealment of proceeds of firearms and drug trafficking; (2) surveillance; (3) analysis and processing of documentary, electronic, and physical evidence; (4) the legal and illegal purchase of firearms; (5) the execution of arrest and search warrants seeking firearms and narcotics; and (6) firearms trafficking.

6.   The facts in this Affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents, law enforcement officers, and witnesses.  This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.   Based on the facts set forth in this Affidavit, there is probable cause to believe that criminal violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) have been committed and are being committed by Ajee WHITTER.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and fruits of these crimes as further described in Attachment B.

8.   The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

PROBABLE CAUSE

9.   The United States, including the Bureau of Alcohol, Tobacco, Firearms & Explosives, is conducting a criminal investigation of Ajee WHITTER ("WHITTER") regarding possible violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

10. On April 11, 2022, a Fairfax County Police Department ("FCPD") Detective acting in an undercover capacity (hereinafter, "Det. 1"), arranged to purchase narcotics from WHITTER via a phone conversation with an unindicted co-conspirator ("UCC-1"). Det. 1 was told to meet at the Beacon of Groveton apartment building, located at 6870 Richmond Highway, Alexandria, Virginia, a location within the Eastern District of Virginia.

11. When Det. 1 arrived at the above location, he observed a Cadillac Escalade parked next to a silver or gray BMW sedan, with three black males standing in between the two vehicles. Det. 1 recognized one of the males as UCC-1. Det. 1 also observed that another of the subjects resembled WHITTER and was later identified as such. The third subject was later identified as another unindicted co-conspirator ("UCC-2").

12. Det. 1 notified UCC-1 of his arrival, and UCC-1 verified the vehicle Det. 1 was driving. UCC-1 directed Det. 1 to meet him in the parking garage for the apartments. Det. 1 followed UCC-1 into the garage on foot. Once inside the garage, UCC-1 asked Det. 1 for the money. Det. 1 replied that he needed to see the drugs first. UCC-1 pointed to a plastic bag and loose pills sitting next to a traffic cone on the ground. Det. 1 provided UCC-1 with $500 in pre-recorded funds. UCC-1 then walked back to the parked vehicles and entered the driver's seat of the BMW sedan.

4

WHITTER and UCC-2 entered the Escalade.  As the vehicles began to leave the parking lot, FCPD personnel moved in to arrest WHITTER, UCC-1, and UCC-2.

13. UCC-1 was taken into custody after ramming a police vehicle and fleeing first in a vehicle and then on foot.  FCPD personnel stopped the Escalade at the location of the undercover purchase.  The occupants of the Escalade at the time it was stopped were its driver, who was determined to be uninvolved, WHITTER, and UCC-2.  WHITTER was observed by an FCPD detective throwing a black satchel into the back of the vehicle.  The satchel was found to contain a Polymer80, model PF940C, 9x19mm caliber pistol bearing no serial number.  The pistol was loaded with a drum-type magazine at the time of its recovery and an additional magazine was located in the satchel.  The two (2) magazines were later found to contain a total of approximately fifty-six (56) rounds of assorted brand, 9mm Luger caliber ammunition.  At the time of his arrest, WHITTER was also found to be in possession of the five hundred dollars ($500) in pre-recorded buy funds from the preceding transaction between UCC-1 and Det. 1.

14. At the time of his arrest, UCC-2 was seated in the middle row of the Escalade.  An FCPD detective observed UCC-2 bent forward but was unable to see his hands.  At UCC-2's feet and pushed under the front passenger seat was a Glock, model 22, .40 S&W caliber pistol, bearing serial number BGWY915.  Next to the firearm was an orange pill bottle containing approximately seventy (70) suspected pressed fentanyl pills.  Also located in the middle seat area of the vehicle was a small black bag containing approximately two (2) grams of suspected cocaine and a white pill bottle containing half of a suspected oxycodone pill.

15. Following his arrest, law enforcement learned that WHITTER was a convicted felon, and therefore prohibited from possessing firearms and ammunition.  Via a records check inquiry run through the National Crime Information Center ("NCIC"), your Affiant determined that

WHITTER has been previously convicted of multiple felony offenses in the Commonwealth of Virginia.  Your Affiant reviewed court records and learned that WHITTER was convicted in Prince William County in 2013 of felony Grand Larceny, pursuant to Virginia State Code Section 18.2-95.  WHITTER received a four-year sentence with all four years suspended for this offense.  Also in 2013, WHITTER was convicted in Prince William County of felony Robbery, pursuant to Virginia State Code Section 18.2-58.  In 2015, WHITTER received a 20-year sentence with 16.5 years suspended for this offense.

### Instagram account "professorglockz"

16. During the course of his investigation, your Affiant learned from another law enforcement officer that WHITTER had been identified as using an Instagram account with the screenname "professorglockz," which is no longer active.  On May 26, 2022, the Honorable William E. Fitzpatrick issued a search warrant to Meta Platforms, Inc. for the "professorglockz" Instagram account (1:22-SW-308).  In reviewing the search warrant return from Meta Platforms, Inc. ("Return"), your Affiant identified the below photographs of a firearm consistent in appearance with the above-referenced Polymer80 pistol found in the black satchel thrown by WHITTER.  One of the photographs depicts the firearm with a drum-type magazine consistent in appearance with the magazine recovered loaded in the firearm.  The stick-type magazine depicted in the below photographs is not consistent in appearance with the other magazine recovered from the satchel.

17. Per the Return, the below image on the left bears the timestamp: 2022-04-03 13:11:38 UTC.  Per the Return, the below image on the right bears the timestamp: 2022-03-23 15:35:40 UTC.

 

18. Per the Return, the below image was taken on 2022-03-31 at 16:24:09 UTC. The individual holding the firearm in the below image is consistent in appearance with WHITTER.



19. Per the Return, the below image bears the timestamp 2022-03-23 14:32:04 UTC:



20. Below are photographs of the recovered Polymer80 pistol taken by your Affiant on May 4, 2022:





21. Below are photographs of the recovered drum-type and stick-type magazines recovered in and with the pistol taken by your Affiant on June 22, 2022:

 

**Examination of Recovered Ammunition**

22. On June 22, 2022, your Affiant met with Det. 1 to photograph and examine the ammunition from the satchel FCPD personnel observed WHITTER throw at his arrest. When examined by your Affiant, the magazines recovered from the satchel consisted of a stick-type magazine containing one (1) round of Prvi Partizan brand 9mm Luger caliber ammunition, and a drum-type magazine containing thirty-eight (38) rounds of assorted brand, 9mm Luger caliber ammunition. Your Affiant also photographed and examined seventeen (17) rounds of assorted brand, 9mm Luger caliber ammunition that had been previously removed[2] from the magazines.

---

[2] Prior to its examination by your Affiant, FCPD personnel removed this ammunition from the magazines recovered from the satchel and then placed the ammunition in the evidence bag containing the magazines.

Based on your Affiant's training, knowledge, and experience, the above ammunition was not manufactured in the Commonwealth of Virginia, and, therefore, traveled in and/or affected interstate commerce.

### Surveillance of WHITTER

23. Shortly after his above-described arrest, WHITTER was released pending trial and has since been out of custody. Your Affiant and other ATF personnel have conducted surveillance to locate WHITTER. Your Affiant has identified a possible residence and/or narcotics stash location for WHITTER; however, the location of this residence has made physical surveillance difficult. The receipt of real-time location information for the TARGET CELL PHONE will facilitate law enforcement in locating WHITTER, confirming the location of WHITTER's residence and/or narcotics stash location, and eventually taking WHITTER into custody.

### Instagram Account "professorglocks"

24. Since the apparent de-activation of the "professorglockz" Instagram account, your Affiant has searched Instagram for similar accounts possibly operated by WHITTER. On or about May 26, 2022, your Affiant identified an Instagram account with the username "professorglocks." The subject in the account's profile picture was consistent in appearance with WHITTER, but the account's content was private.

25. Your Affiant is aware of the following information in reference to Instagram:

    a. Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

    b. Meta collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP")

addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

c.   Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

d.   Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

e.   One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

26. On or about July 20, 2022, your Affiant requested to follow the "professorglocks" account utilizing an undercover Instagram account. The request to follow the account was accepted almost immediately after it was sent. Your affiant captured the following images of the account and of posts on the account:







27. The below image is a screenshot taken by your Affiant on or about July 25, 2022 of from a video "story" posted to the account:



28. Based upon the above posts, your Affiant believes that WHITTER continues to possess firearms and ammunition following his April 11, 2022 arrest. Your Affiant additionally observed

WHITTER post images and videos depicting large quantities of suspected marijuana, marijuana plants, and United States currency, to include the below image captured by your Affiant on or about July 26, 2022.  Based upon your Affiant's training, knowledge, and experience, the items in this image are consistent with illegal narcotics trafficking.



29. A pen register/trap trace order was obtained for the "professorglocks" Instagram account.  Beginning on August 2, 2022, your Affiant has received periodic updates in reference to the account activity, to include the IP addresses, specifically IP version 6 or IPv6 addresses, utilized by the account holder. Via open source search tools, your Affiant queried multiple IPv6 addresses received across several days, and all IPv6 addresses queried returned with Verizon as their service provider. It is your Affiant's knowledge that Verizon can identify the subscriber who utilized an IPv6 address at a given point in time and associate it with a related device account.

30. In my training and experience, I have learned that the TELEPHONE SERVICE PROVIDER is a company that provides cellular communications service to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information (1) about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

31. Based on my training and experience, I know that the TELEPHONE SERVICE PROVIDER can collect E-911 Phase II data about the location of the TARGET CELL PHONE, including by initiating a signal to determine the location of the TARGET CELL PHONE on TELEPHONE SERVICE PROVIDER's network or with such other reference points as may be reasonably available.

32. Based on my training and experience, I know that TELEPHONE SERVICE PROVIDER can collect cell-site data about the TARGET CELL PHONE.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as TELEPHONE SERVICE PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

33. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT").  RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell site data.

34. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an

20

Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").   The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen/trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

35. Based on my training and experience, I know that wireless providers such as the TELEPHONE SERVICE PROVIDER typically collect and retain information about their subscribers in their normal course of business.   This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.   I also know that wireless providers such as the TELEPHONE SERVICE PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.   In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET CELL PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

<u>AUTHORIZATION REQUEST</u>

36. Based on the foregoing, I request that the Court issue the proposed Search Warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

37. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the TARGET CELL PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

38. I further request that the Court direct the TELEPHONE SERVICE PROVIDER to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the TELEPHONE SERVICE PROVIDER.  I also request that the Court direct the TELEPHONE SERVICE PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with services of the TELEPHONE SERVICE PROVIDER, including by initiating a signal to determine the location of the TARGET CELL PHONE on the network of the TELEPHONE SERVICE PROVIDER or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the TELEPHONE SERVICE PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

39. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELL PHONE outside of daytime hours.

Respectfully submitted,

_____

Special Agent Samuel Supnick
Bureau of Alcohol, Tobacco, Firearms & Explosives


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on August 18, 2022.


_____
Hon. Theresa C. Buchanan
United States Magistrate Judge

## **ATTACHMENT A**

<u>PROPERTY TO BE SEARCHED</u>

1.   THE CELLULAR DEVICE ACCESSING IPV6

2600:1003:b12f:6e29:122:cc62:83f8:6b72 ON AUGUST 17, 2022 AT 08:55:02 UTC THAT IS

STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS ("TARGET CELL

PHONE"), whose wireless service provider is VERIZON WIRELESS ("TELEPHONE

SERVICE PROVIDER PROVIDER"), headquartered in Bedminster, New Jersey.

2.   Records and information associated with the TARGET CELL PHONE that is within

the possession, custody, or control of the TELEPHONE SERVICE PROVIDER.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**I.    INFORMATION TO BE DISCLOSED BY THE PROVIDER**

To the extent that the information described in Attachment A is within the possession, custody, or control of the TELEPHONE SERVICE PROVIDER, including any information that has been deleted but is still available to the TELEPHONE SERVICE PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the TELEPHONE SERVICE PROVIDER is required to disclose to the government the following information pertaining to the TARGET CELL PHONE listed in Attachment A and its related account with the TELEPHONE SERVICE PROVIDER ("SUBJECT ACCOUNT"):

**A.   The following information about the customers or subscribers associated with the SUBJECT ACCOUNT for the time period of 60 days preceding the date the Warrant is executed up to the present:**

1.  Names (including subscriber names, user names, and screen names);

2.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3.  Local and long distance telephone connection records;

4.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5.  Length of service (including start date) and types of service utilized;

6.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

7.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

**B. The following historical stored telecommunications records associated with the SUBJECT ACCOUNT for the time period of 60 days preceding the date the Warrant is executed up to the present:**

1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT ACCOUNT, including:

   a. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. All available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET CELL PHONE as well as per-call measurement data (also known as "real-time tool" or "RTT").

**C. The following prospective data associated with the TARGET CELL PHONE for the time period of 30 days from the date of the Warrant (or the date the monitoring of the TARGET CELL PHONE's location becomes operational, whichever is later:**

1. Information associated with each communication to and from the TARGET CELL PHONE for a period of 30 days from the date of the Warrant or the date the monitoring equipment for the device's location becomes operational, whichever is later, during all times of day and night, including:

   a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   b. Source and destination telephone numbers;

   c. Date, time, and duration of communication; and

   d. All available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET CELL PHONE as well as per-call measurement data (also known as "real-time tool" or "RTT").

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.   INFORMATION TO BE SEIZED BY THE GOVERNMENT

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits] of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) involving Ajee WHITTER during the period April 11, 2022 through present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the TELEPHONE SERVICE PROVIDER in order to locate the things particularly described in this Warrant.